

FILED

DEC 18 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VAXIION THERAPEUTICS, INC.,<br><br>                                        Plaintiff,<br><br>        vs.<br><br><br><br>FOLEY & LARDNER LLP and DOES 1<br>through 20, inclusive,<br><br>                                        Defendants. | CASE NO. 07cv00280-IEG (RBB)<br><br>**ORDER: (1) DENYING PLAINTIFF'S MOTION FOR SUMMARY ADJUDICATION OF LIABILITY [Doc. No. 94]; (2) GRANTING DEFENDANT'S MOTION TO STRIKE EVIDENCE CITED IN SUPPORT OF PLAINTIFF'S MOTION [Doc. No. 131]; (3) DENYING AS MOOT DEFENDANT'S MOTION TO STRIKE EVIDENCE OF SETTLEMENT MEETING CITED IN SUPPORT OF PLAINTIFF'S REPLY [Doc. No. 146]** |

Plaintiff Vaxiion Therapeutics ("Vaxiion") moves the Court for summary adjudication of liability on its Negligence and Breach of Fiduciary Duty Claims. Defendant Foley & Lardner ("Foley") has filed an opposition. Defendant has also filed a motion to strike evidence cited in support of plaintiff's motion for summary adjudication and a motion to strike evidence of a settlement meeting cited in support of plaintiff's reply in support of motion for summary adjudication.

The Court heard oral argument on the motions on November 10, 2008. After considering all the arguments of the parties, for the reasons explained herein, the Court DENIES plaintiff's motion for summary adjudication and GRANTS defendant's motion to strike evidence cited in support of plaintiff's motion. The Court also DENIES AS MOOT defendant's motion to strike evidence of settlement meeting, and overrules all of the parties' evidentiary objections except those the Court specifically addresses herein.

## BACKGROUND

Vaxiion[1] is a startup biotechnology research company that first began performing minicell[2] research in August of 1999. [Transcript of February 20, 2008 Deposition of Roger Sabbadini ("Sabbadini Depo. G"), Ex. G to Garner Decl. ISO Opp. to Motion ("Garner Decl."), Doc. No. 116-13, p. 53:21.] Attorney Richard Warburg performed patent work for Vaxiion in the late 1990s when he worked at the firm of Lyon & Lyon. (Motion at 2.) In 1999, Warburg went to Brobeck, Phelger & Harrison LLP and took Vaxiion with him as a client. [Transcript of February 20, 2008 Deposition of Roger Sabbadini ("Sabbadini Depo. A"), Ex. A to Motion, Doc. No. 94-2, pp. 173:1-24.] There, Warburg began working with an associate, Andrew Granston, on the drafting and prosecution of patent applications for Vaxiion. Both Granston and Warburg began practicing law at Foley and Lardner in early 2001 [Warburg Decl. ISO Opp. to Motion ("Warburg Decl."), Doc. No. 116-49, ¶ 1; Granston Decl. ISO Opp. to Motion ("Granston Decl."), Doc. No. 116-23, ¶ 1,] and Vaxiion continued to retain them as counsel in part to continue work on the minicell patent application. (Granston Decl. at ¶¶ 4-5.) Roger Sabbadini, Vaxiion's founder, felt comfortable with Warburg and Granston's qualifications and competence when he asked them to draft Vaxiion's first minicell application. (Granston Decl. at ¶¶ 3-5; Sabbadini Depo. G, pp. 181:21-182:23.)

On May 24, 2001, Warburg[3] and Granston filed a U.S. provisional patent application on behalf of Vaxiion entitled "Minicell Compositions and Methods" ("First Provisional Application"). (Complaint, ¶¶ 6-7; Granston Decl. at ¶ 6, Ex. B.) Both Foley and Vaxiion worked together to prepare the First Provisional Application. [Granston Decl. at ¶¶ 6, 10; Transcript of February 8, 2008 Deposition of Neil Berkley ("Berkley Depo."), Ex. K to Garner Decl., Doc. No.

---

[1]     Roger Sabbadini, a San Diego State University professor initially founded Vaxiion as a company called MedLyte. [Transcript of February 20, 2008 Deposition of Roger Sabbadini ("Sabbadini Depo. G"), Ex. G to Garner Decl. ISO Opp. to Motion ("Garner Decl."), Doc. No. 116-13, pp. 9:10-13, 11:14-19, 12:4-17.] In July 2001, Sabbadini and other investors formed a new company called Mpex which purchased Medlyte's minicell technology. Mpex changed its name to Vaxiion in 2004. (Id. 64:18-22.) For the sake of simplicity, this Order will refer to the company simply as "Vaxiion."

[2]     A "minicell is a small achromosomal (i.e., without chromosomes) cell that is produced by abnormal and unequal division of a parent cell." (Opp. at 3, n. 4.)

[3]     Vaxiion disputes Warburg's level of involvement and oversight in the patent prosecution process, as is discussed further below.

1   116-18, pp. 50:6-51:5, 56:14-22, 63:12-20; Sabbadini Depo. G, pp. 185:19-25.]  On February 25,

2   2002, Foley attorneys Warburg and Granston filed a second provisional application with the same

3   title ("Second Provision Application"). (Complaint, ¶¶ 6-7; Granston Decl. at ¶ 9, Ex. E.)  Vaxiion

4   was fully satisfied with both the First and Second Provisional Applications. [Transcript of July 8,

5   2008 Deposition of Harry F. Manbeck, Jr. ("Manbeck Depo."), Ex. F. to Garner Decl., Doc. No.

6   116-12, pp. 225:20-23; Sabbadini Depo. G, pp. 186:19-21, 203:14-16; Granston Decl. at ¶¶  6, 9,

7   Exs. C, F.]

8            To claim priority in the U.S. to the First Provisional Application filed on May 24, 2001,

9   Vaxiion had to file a non-provisional (or "utility") U.S. application within one year, or by May 24,

10  2002.  In order to claim priority to the First Provisional Application outside the U.S., Vaxiion had

11  to file a Patent Cooperation Treaty ("PCT") application by the same date.  In July 2001, Vaxiion

12  hired Mark Surber as its Chief Scientific Officer.  Surber became the primary contact with Foley

13  regarding the utility and PCT applications. [Granston Decl. at ¶ 16; Transcript of February 15,

14  2008 Deposition of Mark Surber, Ph.D. ("Surber Depo."), Ex. J. to Garner Decl., Doc. No. 116-17,

15  pp. 55:21-56:1; 61:11-13; Sabbadini Depo. G., pp. 202:22-25, 223:5-225:16.]

16           Over the course of many months, Foley and Vaxiion prepared the patent applications.

17  (Granston Decl. at ¶¶ 10-22, Exs. G, I-L, O-T; Warburg Decl. at ¶¶ 15-23, Ex. A; Surber Depo.,

18  pp. 69:3-71:5; Sabbadini Depo. G, pp. 224:4-223:7.)  Warburg and Granston advised Sabbadini,

19  Surber, and William Gerhart, Vaxiion's Chief Executive Officer,  that it would be best to file

20  separate United States Non-Provisional and PCT applications as opposed to a single PCT

21  application (although in the end the two applications were not substantively different).  As such,

22  the Foley lawyers and their clients made the decision together to file the separate applications.

23  (Surber Depo., pp. 69:10-71:7;  Sabbadini Depo. G, pp. 221:7-223:3; Granston Decl. at ¶¶ 11-15;

24  Warburg Decl. at ¶¶ 15-20.)[4]  Furthermore, as part of their filing strategy, the parties agreed to file

25  twenty-three individual patent applications with discrete proposed sets of claims ("non-provisional

26  divisional applications"), as opposed to one application including all 464 of Vaxiion's claims.

27  _____

28  [4]       Plaintiff states Warburg and Granston never told them about the option of filing only a single
    PCT application (Plaintiff's Reply to Defendant's Sep. Stmt. of Add'l. Material Facts ISO Opp., Doc.
    No. 141, at 41,) but cites to nothing in the record to support this allegation.

1   (Surber Depo., pp. 69:10-71:7; Sabbadini Depo. G, pp. 221:7-223:3; Granston Decl. at ¶¶ 11-14;

2   Warburg Decl. at ¶¶ 15-20.)

3       Vaxiion decided to rely on Granston rather than Warburg for the actual drafting of the

4   minicell patent applications (because of Granston's lower billing rate), and communicated

5   primarily with Granston throughout the process. (Sabbadini Depo. G, pp. 181:21-184:23, 200:25-

6   201:11; Warburg Decl. at ¶¶ 8-11, 13, Exs. A-M; Granston Decl. at ¶ 8, 10, Exs. G-N.) Vaxiion

7   was aware of the amount of time Granston spent preparing the United States First and Second

8   Provisional Applications, the U.S. Non-Provisional Application and PCT Application, as

9   compared to the time Warburg spent on the same. (Warburg Decl. at ¶¶ 8-10, Exs. A-F; Granston

10   Decl. at ¶ 10, Exs. G-L; Sabbadini Depo. G, pp. 181:21-184:23, 200:25-201:11.)

11       In the month leading up to the filing deadline, the limited time left to file the multiple

12   divisional applications concerned Surber because he felt Granston did not incorporate his

13   suggestions into the applications quickly enough (Transcript of February 15, 2008 Deposition of

14   Mark Surber, Ph.D., Ex. B to Reply, Doc. No. 140-3, pp. 96-97.) Foley claims that during the

15   same time period Warburg continually warned Vaxiion how important it was for Vaxiion to get the

16   information Foley needed to file the divisional applications by the deadline. (Warburg Decl. at ¶

17   21-22.) Notwithstanding these concerns on both sides, Sabbadini reviewed the specification and

18   claims Warburg and Granston assembled on May 23, 2002 at 6:06 p.m. (the evening before the

19   deadline), proposed no changes to the claims, and believed the application was "excellent" and

20   ready to be filed at that time. (Sabbadini Depo. G, pp. 238:24-239:89-12.)

21       The parties do not dispute Foley knew the PCT application had a May 24, 2002 filing

22   deadline, [Sabbadini Depo. G, pp. 208:20-209:6; Surber Depo., pp. 61:14-24; Ex. H to Motion

23   (November 20, 2002 Letter from Sandra A'Costa to Bill Gerhart [Vaxiion's CEO] reminding him

24   of [the] May 24, 2002 deadline), Doc. No. 94-9; Ex. I to Motion (April 24, 2002 Letter from

25   A'Costa to Gerhart reminding him of the May 24, 2002 deadline), Doc. No. 94-10] that the United

26   States post office closed on 11:00 p.m. on the night of May 24, 2002, and that Granston explained

27   to Surber that he had to deliver the applications to the post office by 11:00 p.m. to receive a May

28   24 postmark on the application. (Granston Decl. at ¶ 24.)

07cv00280

1   Surber nevertheless continued to provide Granston with changes, comments, and additions
2   up until the evening hours before the filing deadline of 11:00 p.m. on May 24, 2002. [Granston
3   Decl. at ¶¶ 22-28, Exs. V-X; Surber Depo., pp. 87:14-89:2, Ex. 99 (timeline of events of May 24,
4   2002 prepared by Surber).]  Granston unilaterally abandoned the strategy of filing the multiple
5   divisional applications in favor of filing one United States non-provisional application on May 24,
6   2002, as the filing deadline "got closer and Surber still had not given his approval to file." (Opp. at
7   12, n.13; see also Reply at 8.)  The last of Surber's series of changes came at 9:50 p.m. on the night
8   of the deadline when Surber instructed Granston by telephone to add several hundred pages of
9   DNA sequences to the application. (Granston Decl. at ¶28, Ex. V; Decl. of Christine E. Whitten,
10  M.D. ISO Opp. ("Whitten Decl."), at ¶¶ 5-6; Decl. of Michelle Sympson ISO Opp. ("Sympson
11  Decl."), at ¶¶ 7-8.)  Granston explained to Surber that the changes were unnecessary, they could be
12  added later by amendment, and that if Granston tried to include them he could not guarantee the
13  filing deadline could be met. (Granston Decl. at ¶28.)  Surber insisted they be added anyway. (Id.)
14      Surber emailed the sequences to Granston at 10:01 p.m., and due to their size, Granston did
15  not receive them all until 10:09 p.m. (Granston Decl. at ¶ 28, Ex. V; Surber Depo., pp. 87:14-89:2,
16  Ex. 99.) At 10:20 p.m., Granston finalized the application, including the DNA sequences, emailed
17  the U.S. Non-Provisional Application to his assistant Michelle Sympson to finalize, and emailed
18  the PCT application to paralegal Sandra A'Costa to format to conform to the PCT formatting rules.
19  (Granston Decl. at ¶ 29, Ex. V; Surber Depo, pp. 87:14-89:2, 184:2-9, 225:5-15; Sympson Decl.
20  at ¶ 9-11.) Dr. Christine Whitten, Granston's girlfriend at the time (now his wife) was also at
21  Foley's offices that night in order to drive with Granston to the post office but did not participate in
22  the preparation or filing of any of Vaxiion's patent applications. (Granston Decl. at ¶ 30; Whitten
23  Decl. at ¶¶ 2-3.) At approximately 10:40 p.m., Granston left for the post office with the completed
24  Non-Provisional Application, and asked Whitten to stay behind until the PCT Application was
25  completed, to drive it to the post office. (Whitten Decl. at ¶7.)  At that time, Whitten states,
26  A'Costa was having trouble formatting the PCT because her computer kept freezing.  Once the
27  computer was working, A'Costa formatted the application, but by the time she finished it was past
28  11:00 p.m., and the post office had closed. (Whitten Decl. at ¶8; Sympson Decl. at ¶13.)

1    Despite trying to reach contacts in Alaska and Hawaii who could still potentially obtain a

2    May 24 postmark on the PCT Application because of the time zone difference, Granston was

3    unable to file the application by the deadline. (Whitten Decl. at ¶ 10-11; Sympson Decl. at ¶15.)

4    Vaxiion thus successfully filed a non-provisional U.S. patent application ("Non-Provisional

5    Application") on May 24, 2002, claiming priority to the First and Second Provisional Applications,

6    (Granston Decl. at ¶ 30, Ex. Y,) and filed the PCT application the next business day, May 28,

7    2002. (Warburg Decl. at¶ 25.)  As a result of the missed PCT Application deadline, Vaxiion is not

8    able to claim priority internationally to the May 24, 2001 First Provisional Application, but only to

9    the February 25, 2002 Second Provisional Application.

10    After Foley filed the First Provisional Application on Vaxiion's behalf on May 24, 2001,

11    but before Foley filed the Second Provisional Application on Vaxiion's behalf on February 25,

12    2002, an attorney in Foley's Washington D.C. office, Stephen Bent, filed a provisional application

13    for an Australian company, EnGeneIC, also covering certain aspects of minicell technology. [Bent

14    Decl. ISO Opp. ("Bent Decl."), Doc. No. 116-2 at ¶ 2.]  On October 15, 2001, Bent filed on behalf

15    of EnGeneIC a provisional application, titled "Intact Minicells as Vectors for DNA Transfer and

16    Gene Therapy In Vitro and In Vivo."  (Id.)  EnGeneIC's PCT Application, which was filed one

17    year later on October 15, 2002, claims priority to EnGeneIC's provisional application, and as a

18    result is considered senior to Vaxiion's PCT Application.  (Id. at ¶ 4.)

19    Foley represented both Vaxiion and EnGeneIC from November 2001 until June 2002.  Prior

20    to the publication of EnGeneIC's PCT Application on April 24, 2003, neither Warburg nor

21    Granston knew of EnGeneIC's provisional application or that Foley D.C. attorney Bent represented

22    EnGeneIC.  (Warburg Decl. at¶ 27; Granston Decl. at ¶ 33.)  In July 2002, (Warburg Decl. at ¶ 26,)

23    Vaxiion terminated its relationship with Foley and instead retained the services of the law firm of

24    Knobbe Martens Olson & Bear.  Knobbe Martens continued its prosecution of Vaxiion's patent

25    applications for minicell technology.  On February 27, 2007, the USPTO issued to Vaxiion Patent

26    No. 7,183,105 (the "105 Patent"), which claimed priority to the First and Second Provisional

27    Applications.  (Garner Decl. at ¶ 4, Ex. D.)

28

- 6 -

1    Vaxiion learned that Foley represented EnGeneIC no later than November 2004. (Sabbadini

2    Depo. G, p. 251.) Vaxiion never, however, raised an issue regarding Foley's continued

3    representation of EnGeneIC until late August 2007, when Plaintiff's counsel indicated Vaxiion

4    would not produce certain laboratory notebooks in discovery because of Foley's continued

5    representation of EnGeneIC. (Garner Decl. at ¶ 17.) Foley withdrew from its representation of

6    EnGeneIC with respect to EnGeneIC's PCT Application and EnGeneIC's Non-Provisional U.S.

7    Application, in late 2007 or early 2008. (Bent Decl. at ¶ 7.) Foley continues to represent

8    EnGeneIC in some patent matters.

9    Before Foley withdrew from its representation of EnGeneIC, in 2006 and 2007, a PTO

10    examiner rejected several claims in EnGeneIC's Non-Provisional U.S. Application partly in light

11    of Vaxiion's Non-Provisional U.S. Application. (McCaslin Decl. at ¶¶ 2 and 4, Exs. A and C.) In

12    response to the examiner's rejection, Foley on behalf of EnGeneIC submitted declarations

13    attempting to antedate the Vaxiion prior art reference (i.e. demonstrate EnGeneIC reduced its

14    invention to practice before Vaxiion). (McCaslin Decl. at ¶¶ 3 and 5.) On July 25, 2007, the PTO

15    withdrew its rejection of EnGeneIC's Non-Provisional Application based upon Vaxiion's Non-

16    Provisional U.S. Application, and instead rejected EnGeneIC's application based upon Vaxiion's

17    then-issued '105 Patent. (Id. at ¶ 6, Ex. E.)

18    **DISCUSSION**

19    A.    Legal Standard

20    Summary judgment is proper where the pleadings and materials demonstrate "there is no

21    genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of

22    law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A material issue

23    of fact is a question the trier of fact must answer to determine the rights of the parties under the

24    applicable substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute

25    is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

26    party." Id. at 248.

27    The moving party bears "the initial responsibility of informing the district court of the basis

28    for its motion." Celotex, 477 U.S. at 323. To satisfy this burden, the moving party must

1   demonstrate that no genuine issue of material fact exists for trial, Id. at 322, and may do this by

2   "pointing out to the district court that there is an absence of evidence to support the nonmoving

3   party's case." Celotex, 477 U.S. at 325; see Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d

4   1099, 1106 (9th Cir. 2000).  Additionally, to obtain a summary judgment, "'the moving party must

5   offer evidence sufficient to support a finding upon every element of his [or her] claim . . ., except

6   those elements admitted . . .' by the adversary." Watts v. United States, 703 F.2d 346, 347 (9th

7   Cir. Cal. 1983) (citing United States v. Dibble, 429 F.2d 598, 601 (9th Cir. 1970)).  However, the

8   moving party is not required to negate those portions of the non-moving party's claim on which the

9   non-moving party bears the burden of proof.  Celotex, 477 U.S. at 323.

10          To withstand a motion for summary judgment, the non-movant must then show that there

11   are genuine factual issues which can only be resolved by the trier of fact.  Reese v. Jefferson Sch.

12   Dist. No. 14J, 208 F.3d 736, 738 (9th Cir. 2000) (citing Fed. R. Civ. P. 56; Celotex, 477 U.S. at

13   323).  The nonmoving party may not rely on the pleadings but must present specific facts creating a

14   genuine issue of material fact.  Nissan Fire, 210 F.3d at 1103.  The inferences to be drawn from

15   the facts must be viewed in a light most favorable to the party opposing the motion, but conclusory

16   allegations as to ultimate facts are not adequate to defeat summary judgment.  Gibson v. County of

17   Washoe, Nev., 290 F.3d 1175, 1180 (9th Cir. 2002).  The Court is not required "to scour the record

18   in search of a genuine issue of triable fact," Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996),

19   but rather "may limit its review to the documents submitted for purposes of summary judgment

20   and those parts of the record specifically referenced therein." Carmen v. San Francisco Unified

21   Sch. Dist., 237 F.3d 1026, 1030 (9th Cir. 2001).

22   B.     Motions to Strike and Evidentiary Objections

23          Defendant has brought two motions to strike evidence which plaintiff cites in support of its

24   Motion: (1) Motion to Strike Evidence Cited In Plaintiff's Motion for Summary Adjudication

25   ("Motion to Strike MSA Evidence," Doc. No. 131); (2) Motion to Strike Evidence of Settlement

26   Meeting Cited in Support of Plaintiff's Reply in Support of Motion for Summary Adjudication

27   (Doc. No. 146.)  Both parties also filed numerous evidentiary objections.  As explained below, the

28   Court GRANTS defendant's Motion to Strike MSA Evidence because plaintiff has not shown that

1    its expert is qualified to give opinions with regard to legal ethics and conflicts of interest.[5]  The

2    Court finds defendant's second motion to strike and the parties' evidentiary objections beyond

3    those discussed below do not impact the Court's substantive determination of the merits of

4    plaintiff's motion for summary adjudication.  The Court accordingly DENIES the motion and

5    objections as moot.

6          Defendant objects to the following deposition testimony excerpts and opinions rendered in

7    the expert reports [6]of plaintiff's expert Harry F. Manbeck:

8    1.   Transcript of July 8, 2008 Deposition of Harry F. Manbeck, Jr., page
          65, line 20 through page 66, line 18, regarding a legal ethics rule at
9         issue in this case, [("Manbeck Depo"), Doc. No. 131-44, Ex. A to
          Motion to Strike MSA Evidence, pp. 65:20-66:18] PTO Code
10        Section 10.66.  37 C.F.R. § 10.66.  (Memo. ISO Motion to Strike
          MSA Evidence at 2.)  Plaintiff cites the testimony in its Motion and
11        Separate Statement in Support of Motion for Summary Adjudication
          [("Separate Statement"), Doc. No. 94-47] to support its argument
12        that Foley breached its fiduciary duty to Vaxiion.

13   2.   Any paragraphs of Manbeck's expert reports discussing his opinions
          on ethics and conflicts of interest, "to the extent that plaintiff intends
14        to rely upon them."  (Memo. ISO Motion to Strike MSA Evidence at
          3 n.2.)
15
16   3.   Paragraphs 41, 43, 44, and 48 of the Expert Report of Harry
          Manbeck cited in plaintiff's Separate Statement, paragraphs 7 and
          22. [Defendant's Objections to Plaintiff's Evidence ISO Motion for
17        Summary Adjudication ("Evid. Objections"), Doc. No. 117, at 2-6.]
          Plaintiff cites the report in support of its assertion Foley committed
18        professional negligence in its untimely filing of the PCT application.

19   4.   Paragraph 5 of the Rebuttal Expert Report of Harry Manbeck cited in
          plaintiff's Separate Statement, paragraph 9 (Evid. Objections at 6.)
20        Plaintiff cites the rebuttal report in support of its assertion Foley
          committed professional negligence in its untimely filing of the PCT
21        application.

22

23   _____

24   [5]    Plaintiff argues defendant's motions to strike are disallowed by Fed. R. Civ. P. 12(f).  This
     argument is misplaced because the Court has discretion to strike inadmissible evidence filed in support
25   of a summary judgment motion.  Bliesner v. Commun. Workers of Am., 464 F.3d 910, 915 (9th Cir.
     2006) (holding a district court did not abuse its discretion when it struck part of an affidavit supporting
26   a motion for summary judgment).

27   [6]    Defendant also objects to the expert reports of Manbeck and plaintiff's other experts, arguing
     they are improperly authenticated under Fed. R. Evid. 901 and Fed. R. Civ. P. 56(e).  (Memo. ISO
28   Motion to Strike MSA Evidence at 1.)  However, plaintiff submitted declarations from its experts
     authenticating the contested expert reports with its Opposition to defendant's Motion to Strike MSA
     Evidence.  (Opp. to Motion to Strike MSA Evidence, Doc. Nos. 148-3; 148-6; 148-9; 148-11.)

5.  Transcript of July 8, 2008 Deposition of Harry F. Manbeck, Jr., page 187, line 3 through line 23, and page 189, line 23 though page 190, line 23, cited in plaintiff's Separate Statement, paragraph 9. (Evid. Objections at 7, 9.) Plaintiff cites the testimony in support of its assertion Foley committed professional negligence in its untimely filing of the PCT application.

Defendant argues this evidence is inadmissible under Fed. R. Evid. 702 because Manbeck does not have the knowledge, skill, experience, training or education in the area of attorney ethics or attorney standards of care to enable him to render expert opinions in these areas, even though Manbeck may be qualified to opine on matters relating to patent procedures. See, e.g. Memo. ISO Motion to Strike MSA Evidence at 3. Essentially, defendant argues Manbeck is no more qualified than the average lawyer to testify about legal ethics or conflicts of interest.

Federal Rule of Evidence 702 provides, in relevant part:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise . . . .

Fed. R. Evid. 702 (2008). To qualify as an expert, a witness must have "knowledge, skill, experience, training, or education" relevant to such evidence or fact in issue, Id., and "expert testimony must ... address an issue beyond the common knowledge of the average layman." United States v. Vallejo, 237 F.3d 1008, 1019 (9th Cir. 2001), amended by 246 F.3d 1150 (9th Cir. 2001). The admissibility of expert testimony is within the sound discretion of the trial judge, "'who alone must decide the qualifications of the expert on a given subject and the extent to which his opinions may be required." United States v. Chang, 207 F.3d 1169, 1172 (9th Cir. 2000) (citation omitted).

Plaintiff designated Manbeck[7] as its sole expert not only on patent procedure matters, but also on legal ethics and conflict of interest matters. [Export Report of Harry F. Manbeck, Jr. ("Manbeck Report"), Doc. No. 94-31, Ex. "V" ISO Motion at ¶ 5.] Manbeck testified in his

---

[7]  Harry F. Manbeck, Jr. is a former Assistant Secretary of Commerce and Commissioner of Patents and Trademarks of the United States, and was appointed by former President George H.W. Bush. He practiced patent law for approximately 35 years before becoming PTO Commissioner in 1990 (where he served until 1992). In his current practice he is "often asked to provide expert consulting or testimony about patent issues." (Manbeck Report at ¶¶ 1-2.)

1   deposition that he has never held himself out as an expert on legal ethics, patent ethics, or conflicts

2   of interest. [Transcript of July 8, 2008 Deposition of Harry Manbeck ("Manbeck Depo. A"), Ex. A

3   to Garner Decl. ISO Motion to Strike MSA Evidence, Doc. No. 131-3, pp. 36:9-14.] Manbeck

4   also testified he: (1) never received any training on ethics issues (Id., p. 34, lines 11-15); (2) never

5   represented a party in a legal malpractice case (Id., p. 80, lines 18-22); (3) has only been designated

6   an expert in (at most) two legal malpractice cases, neither having to do with conflicts of interest

7   (Id., p. 35, line 2-36, line 25); and (4) as USPTO Commissioner was not involved in disciplining

8   lawyers and did not oversee the revisions of any ethics rules (Id., pp. 25, line 20-26, line 21.)

9          Plaintiff argues Manbeck's excess of 50 years of experience in the field of patent law give

10   him an adequate basis for opining as to the conduct a lawyer in his field should adopt, and though

11   he has had no special training in ethics, he has had generalized training (i.e. Mandatory/Minimum

12   Continuing Legal Education) regarding ethics and avoidance of conflicts of interest.  (Opp. to

13   Motion to Strike MSA Evidence at 4.)  Plaintiff also attaches a declaration from Manbeck to its

14   Opposition, stating that despite his lack of specialized ethics training he has "certainly been well

15   aware of ethical standards to which attorneys are held and [has] consistently complied with them

16   throughout [his] career."  [Decl. of Harry F. Manbeck ISO Opp. to Motion to Strike ("Manbeck

17   Decl. ISO Opp."), Doc. No. 148-11, at ¶ 4.]

18          To be admissible, "expert testimony must … address an issue beyond the common

19   knowledge of the average layman." United States v. Vallejo, 237 F.3d 1008, 1019 (9th Cir. 2001),

20   amended by 246 F.3d 1150 (9th Cir. 2001).  Plaintiff concedes Manbeck has had no specific or

21   special ethics training or professional experience in ethical matters, and Manbeck merely asserts he

22   has been "aware of ethical standards."  This "awareness" hardly constitutes "knowledge, skill,

23   experience, training, or education" in ethics beyond that of an average lawyer.  Plaintiff does not

24   cite, and the Court has not found, any binding authority stating that length of tenure in a given

25   profession on its own, or mere "awareness" and familiarity with a disciplinary rule such as Rule

26   10.66 qualifies a person as an expert in the ethical matters of that profession.  The Court

27   accordingly finds Fed. R. Evid. 702 precludes Manbeck from opining as an expert on matters of

28

1  attorney ethics, attorney standards of care, or conflicts of interest.  However, Manbeck is qualified

2  to opine as an expert in matters relating to patent office procedures.

3  **C.**      Interlocutory Summary Judgment Rendered on Liability Alone

4          Plaintiff moves for summary adjudication of liability of its negligence and breach of

5  fiduciary duty claims pursuant to Federal Rule of Civil Procedure 56(a).  (Motion at 6.)  Rule 56

6  requires a party moving for summary judgment to offer evidence sufficient to support a finding

7  upon every element of the claim.  Watts, 703 F.2d at 347 (9th Cir. Cal. 1983) (citation omitted).

8  Both causation and damages are **necessary elements** for a finding of malpractice **liability** as well

9  as breach of fiduciary duty **liability**.  Osornio v. Weingarten, 124 Cal. App. 4th 304, 319 (Cal. Ct.

10 App. 2004) (laying out the elements of a professional negligence claim); Stanley v. Richardson, 35

11 Cal. App. 4th 1070, 1077 (Cal. Ct. App. 1995) (laying out the elements for a breach of fiduciary

12 duty claim).  However, plaintiff does not offer evidence sufficient to support a finding upon every

13 element of its claims, because the motion only cursorily addresses the elements of causation and

14 damages.  Plaintiff's Reply explains this strategy by citing to Federal Rule of Civil Procedure

15 56(d)(2) ("[a]n interlocutory summary judgment may be rendered on liability alone, even if there is

16 a genuine issue on the amount of damages," Fed. R. Civ. P. 56(d)(2) (2008)), and by stating it

17 seeks a court order "adjudicating liability, leaving the issues of causation and damages for trial."

18 (Reply at 10.)

19         As set forth in the discussion below, plaintiff has failed to make a sufficient showing with

20 regard to the breach element of each claim.  Accordingly, the Court need not reach the question of

21 whether plaintiff may seek summary judgment on "liability" without addressing the causation and

22 damages elements of both claims.[8]

23

24 [8]     The Court is not persuaded plaintiff can seek adjudication of "liability" under Rule 56(d)(2)
   without making a sufficient showing for a finding on each essential element of both claims because
25 only "genuine issues on the amount of damages" may be reserved for trial after an interlocutory
   summary judgment on liability. Fed. R. Civ. Proc. 56(d)(2); Van Curen v. Bank of the West (In re
26 Hat), 2007 Bankr. LEXIS 3055, at *22 (Bankr. E.D. Cal. 2007) (holding plaintiff trustee was not
   entitled to interlocutory summary judgment without addressing affirmative defenses directed at the
27 issue of respondent bank's liability); cf. Great Am. Ins. Co. v. N. Am. Specialty Ins. Co., 542 F. Supp.
   2d 1203, 1211 (D. Nev. 2008) (finding the defendant business partner liable for legal defense expenses
28 it should have contributed to a past lawsuit against the partnership, even though the plaintiff, another
   partner, did not present evidence showing what expenses [i.e. amount of damages] it was entitled to

1    D.      Plaintiff's Motion for Summary Adjudication Re: "Negligence Liability/Missed Deadline"

2           *1.      Professional Malpractice by an Attorney: Legal Standard*

3           Plaintiff first argues it is entitled to summary judgment on its negligence claim.  Plaintiff has

4    conceded that the negligence cause of action is essentially one of legal malpractice (Memo ISO of

5    Motion to Remand, Doc. No. 3, at 3), and the Court has treated it as such (see, e.g. Order Denying

6    Remand, Doc. No. 14, at 7.)  In its summary adjudication argument on the negligence cause of

7    action, plaintiff lays out the elements of traditional tort negligence ("duty, breach of duty, legal

8    cause, and resultant damage") and then asserts that "legal malpractice claims are subject to the

9    same legal standards as general negligence claims"  (Motion at 6,) citing Osornio v. Weingarten,

10   124 Cal. App. 4th 304, 319 (2004) (in which the court evaluated the scope of an attorney's duty to

11   non-client beneficiaries of a will).

12          The Osornio court held there are four essential elements of a professional negligence claim:

13   "(1) the duty of the professional to use such skill, prudence, and diligence as other members of his

14   profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal

15   connection between the negligent conduct and the resulting injury; and (4) actual loss or damage

16   resulting from the professional's negligence. [Citations.]" Osornio v. Weingarten, 124 Cal. App.

17   4th 304, 319 (Cal. Ct. App. 2004).  See also Ambriz v. Kelegian, 146 Cal. App. 4th 1519, 1531

18   (Cal. Ct. App. 2007); Coscia v. McKenna & Cuneo, 25 Cal. 4th 1194, 1199-1200 (Cal. Ct. App.

19   2001) (addressing attorney negligence in criminal cases) (Opp. at 10.)  The Court now addresses

20   plaintiff's evidence as to each element.

21          *a)      Element 1: Duty of Care*

22          Foley concedes that it owed Vaxiion a duty of care. (Opp. at 10.)  The Court accordingly

23   finds that the existence of a duty of care is an issue not in dispute in this case.

24          *b)      Element 2: Breach of the Duty of Care*

25                  *i)  Legal Standard*

26          In a negligence action, "[b]reach of duty is usually a fact issue for the [fact finder]; if the

27   circumstances permit a reasonable doubt whether the defendant's conduct violates the boundaries

28   ——————————————

as a matter of law).

1    of ordinary care, the doubt must be resolved as an issue of fact by the [fact finder] rather than of

2    law by the court." Ishmael v. Millington, 241 Cal. App. 2d 520, 525 (Cal. Ct. App. 1966).  Breach

3    of a duty of reasonable care in a professional malpractice situation is the failure of an attorney to

4    use such skill, prudence, and diligence as other members of his profession commonly possess and

5    exercise. Osornio v. Weingarten, 124 Cal. App. 4th 304, 319 (Cal. Ct. App. 2004).  In a legal

6    malpractice action, expert testimony is required to establish the prevailing standard of skill and

7    learning in the locality and the propriety of particular conduct by the practitioner in particular

8    circumstances, as such standard and skill is not a matter of general knowledge.  Lipscomb v.

9    Krause, 87 Cal. App. 3d 970, 975 (Cal. Ct. App. 1978).  When a party in a professional

10   malpractice claim moves for summary judgment and supports the motion with expert declarations

11   as to whether a professional's conduct fell within  the community standard of care, he is entitled to

12   summary judgment unless the opposing party comes forward with conflicting expert evidence.

13   Hutchinson v. United States, 838 F.2d 390, 392 (9th Cir. 1988) (citing Willard v. Hagemeister, 121

14   Cal. App. 3d 406, 412, 175 Cal. Rptr. 365, 369 (Cal. Ct. App. 1981)).  Expert evidence is not

15   needed, however, when the type of conduct required by the particular circumstances is within the

16   knowledge of laymen. Id. at 392 n. 1.

17                                      *ii)   Failure to File On Time*

18        Plaintiff contends first Foley breached its duty of due care to Vaxiion (Motion at 7,)

19   explaining and supporting this contention by stating "Foley & Lardner represented Vaxiion when

20   Foley prepared and untimely filed Vaxiion's PCT patent application on May 28, 2002." [Transcript

21   of January 29, 2008 Deposition of Drew Granston, Ph.D. ("Granston Depo."), Doc. No. 94-4, Ex.

22   C to Motion, pp. 210:11-14; 269:18-270:18.]  Plaintiff solely relies on the deposition testimony

23   and expert reports of Harry Manbeck  and the deposition testimony of David Hricik, defendant's

24   expert witness,[9] to support this contention.  (Motion at 8.)

25

26   [9]    Professor David Hricik is a tenured Associate Professor of Law at Mercer University School of
     Law, where he has taught since 2002. He teaches both ethics and patent law, among other courses.
27   He has been the Chair of the Professionalism & Ethics Committee of the American Intellectual
     Property Law Association and the Chair of the Ethics & Professionalism Committee of the Intellectual
28   Property Law Section of the American Bar Association. He previously taught ethics at the University
     of Texas School of Law as well as the University of Houston Law School.  Since the early 1990s he

1    Plaintiff's expert, Mr. Manbeck, asserts: "[t]he failure to file the PCT application on or

2    before the May 24, 2002 deadline was malpractice." (Manbeck Report at ¶ 43.) Manbeck himself

3    cites the PTO rules regarding general standards for competent legal representation (Id. at ¶ 40,)[10]

4    and Kairos Scientific Inc.v . Fish & Richardson, 2006 Cal. App. Unpub. LEXIS 667 (Cal. Ct. App.

5    2006), an unpublished California Court of Appeal case. In addition, plaintiff cites testimony of

6    defendant's expert, David Hricik , that Vaxiion and Foley and Lardner "shared" responsibility for

7    missing the filing deadline. [Transcript of July 18, 2008 Deposition of David Hricik ("Hricik

8    Depo."), Doc. No. 94-44, Ex. II to Motion, p. 8.] Based upon these two experts' statements,

9    Vaxiion argues it is entitled to judgment on the issue of liability on the negligence claim.

10    However, Foley asserts there are numerous disputed material facts regarding its alleged

11    breach of duty owed to Vaxiion.  In particular, Foley contends  Mark Surber and in effect, Vaxiion,

12    were the actual causes of the delay in finalizing the patent applications because of their unyielding

13    requests for changes and modifications of the application until and including the final hour before

14    the deadline.  Foley's expert, David Hricik, opines strict liability does not apply to missed filing

15    deadlines under these circumstances because Foley's ability to meet the deadline was hampered by

16    Vaxiion. (Hricik Report at 27.) Hricik explains "a practitioner cannot file an application–or decide

17    whether one application is better than more than one . . . without client authorization. [citation

18    omitted] [The application] process required input from the client, not unilateral action by the firm."

19    (Id. at 27-28.)  Defendant also references this point to rebut plaintiff's claim that Hricik admitted it

20

21    has represented clients "in legal malpractice cases, and in matters concerning disqualification and legal
      ethics generally, in both patent and non-patent cases and in a general advisory role." [Export Report
22    of Professor David Hricik ("Hricik Report"), Ex. W ISO Motion at 1-2.]  Hricik has also represented
      clients in patent lawsuits and appeals from 1989-2002 and has "consulted with practitioners, lawyers,
23    and law firms across the country on patent-ethics matters . . . and [has] frequently acted as a
      confidential ethics advisor to practitioners, lawyers, patent agent, and law firms concerning matters
24    involving ethical issues before the United States Patent & Trademark Office ("PTO"), in patent
      litigation, in state court litigation, as well as in general practice." (Id. at 2-3.)
25

26    [10]    § 10.76 Canon 6 [¶] A practitioner should represent a client competently. [¶] 10.77 Failing to
      act competently.  [¶] A practitioner shall not: [¶] (a) Handle a legal matter which the practitioner
27    knows or should know that the practitioner is not competent to handle, without associating with the
      practitioner another practitioner who is competent to handle it. [¶] (b) Handle a legal matter without
28    preparation adequate in the circumstances. [¶] (c) Neglect a legal matter entrusted to the practitioner.
      [¶] 10.78 Limiting liability to a client. [¶] A practitioner shall not attempt to exonerate himself or
      herself from, or limit his or her liability to, a client for his or her personal malpractice. 37 C.F.R. §
      10.76 (2008).

1   was Foley's fault (because of "shared responsibility") that the deadline was missed.

2   The Court has already found, in Section "B" *supra*, that Manbeck is not an expert qualified to

3   render an expert opinion on attorney standards of care for purposes of this motion.  Even if

4   Manbeck's opinion is considered, a dispute of material fact exists because Manbeck's opinion that

5   missing the deadline was a breach of duty regardless of the circumstances is in direct conflict with

6   Hricik's opinion that no such breach could have occurred because the client was at fault for the

7   missed deadline.  This disputed issue precludes summary judgment.

8                   *iii)   Practices Surrounding Failure to Timely File*

9   Plaintiff next contends that aside from missing the deadline, Foley breached its duty of care

10  by its conduct leading to the missed deadline.  Plaintiff supports these contentions by citing to

11  Manbeck's reports and deposition.  Manbeck's opinions are admissible insofar as he addresses

12  patent office procedures, because the Court has found Manbeck is qualified to opine as an expert

13  on such matters.  See Section "B" *supra*.

14  First, Manbeck states Foley should have focused on filing the PCT application (and simply

15  designated the United States as a selected country for protection) which would have secured

16  protection domestically and abroad, as opposed to "negligently ch[oosing] only to file the United

17  States application" when it became clear that both the United States and PCT applications could

18  not be completed on time. [Motion at 4, 7-8; Manbeck Report at  ¶¶ 44-47; Rebuttal Export Report

19  of Harry F. Manbeck, Jr. ("Rebuttal Report"), Doc. No. 94-45,  Ex. JJ to Motion at ¶¶ 5-7.]

20  Alternatively, Foley could have added  a "PCT Transmittal Letter" and a "PCT Request"  to the

21  improperly formatted request (i.e. the finished United States utility application) as opposed to

22  attempting to reformat it at the last minute to PCT standards.  According to Manbeck, under those

23  circumstances the PTO office would have accepted the application, given it a filing date, and

24  merely required Foley to resubmit the application on the proper paper.  (Motion at 7-8; see also

25  Manbeck Report at ¶¶ 44-47.)  Manbeck asserts that a knowledgeable patent attorney would have

26  known this procedural shortcut.  (Manbeck Report at ¶ 46.)  Plaintiff accordingly asserts "Foley &

27  Lardner had all of the documentation needed to file the PCT application by 10:00 p.m. on May 24,

28  2002," and cites to Granston's deposition testimony to the effect that he "believe[d]" the

1  noncompliant (i.e. unformatted) PCT document, if filed incorrectly, would have preserved the

2  priority date." (Granston Depo., pp. 291:11-296:23.)

3     Second, Manbeck asserts there was a "lack of attorney and staff support" to accomplish the

4  very complex PCT filing indicating "lapses in the professional representation," (Manbeck Report

5  at ¶ 46-47.) Specifically, Manbeck notes senior attorney Warburg was out of town on the day the

6  filing was due, leaving his associate Granston to "fend for himself" in a complex filing situation.

7  Additionally he notes the fact that the computer malfunctioned during the formatting of the PCT

8  application, and a paralegal, Sandra A'Costa, made the determination based on her knowledge that

9  the PCT application would not be accepted if it were formatted incorrectly. Manbeck accordingly

10  criticizes Granston's decision to "rely wholly on a paralegal to know the law related to PCT

11  applications," [Motion at 8, paraphrasing July 8, 2008 Deposition of Harry F. Manbeck, Jr.

12  ("Manbeck Depo."), Doc. No. 94-46, Ex. KK, pp. 187:3-23, 188:3-21, 189:2-11, "23-190:23"; See

13  also Manbeck Report ¶ ¶ 44-47.]

14     Foley counters it did not breach the standard of care by filing separate U.S. patent and PCT

15  applications as opposed to one PCT Application because "practitioners routinely, and for good

16  reasons, file both ways. . . " (Opp. at 14) [citing Mercer[11] Decl. ISO Opp. ("Mercer Decl.") at ¶

17  17.] Foley also points out Vaxiion took part in the decision to file separate applications (Granston

18  Decl. at ¶15), so it could have not been a breach of the standard of care to continue to act

19  consistently with that decision. (Opp. at 14.)

20     In response to plaintiff's assertions Foley should have merely converted its United States

21  application to a PCT application at the last minute, Foley argues that even if it had taken such

22  action, it would nevertheless have been submitting an improperly formatted application after the

23

24

25

---

26  [12]     Defendant retained Chris Mercer as an expert. He is a patent attorney registered in the
    United Kingdom, and the majority of his work involves the prosecution of applications,
27  oppositions and appeals before the European Patent Office, but has also prosecuted applications
    outside of Europe, including in the United States, Canada, and Australia. He has been awarded
28  "a Certificate as a Patent Attorney Litigator due to [his] experience in UK and foreign litigation
    matters," and has also been a member of numerous patent and intellectual property professional
    associations. ( Mercer Decl. at ¶¶ 1-15.)

1    11:00 p.m. deadline. (Opp. at 14-15.)[12] The timeline indicates that when Granston left at 10:40

2    p.m. to take the completed U.S. utility application to the post office, he arrived seconds before it

3    closed (Granston Decl. at ¶ 30,) a fact plaintiff does not dispute.  Manbeck asserts it would only

4    have taken Granston five minutes to attach a "PCT Transmittal Letter" and a "PCT Request" to the

5    finished U.S. utility application to submit it as a PCT Application.  (Manbeck Depo., pp. 190:20.)

6    If Granston had left for the post office at 10:45 however, it would have already closed (judging by

7    the fact he only narrowly missed filing the utility application when he left at 10:40,) in which case

8    neither the U.S. utility application nor the PCT application would have been timely filed.  By this

9    "timeline" argument, defendant demonstrates that because plaintiff took until 10:09 p.m. to

10   provide the materials it wished to be included in the applications, there is nothing Foley could have

11   done to get both the PCT and U.S. utility applications to the post office on time.

12        In response to plaintiff's arguments that Foley improperly relied on associate Granston as the

13   primary drafter and contact person on the application, and on paralegal A'Costa for her knowledge

14   about formatting rules for PCT applications, Foley submits: 1) Granston had extensive experience

15   in patent filings (over 100 previous filings) (Granston Decl. at ¶¶ 1-4); 2) Vaxiion was aware of

16   and agreed to the respective roles of Warburg and Granston (Id. at ¶¶ 8, 10, Exs. G-L; Warburg

17   Decl. at ¶¶ 9, 10, Exs. A-F; Sabbadini Depo. G., pp. 181:21-184:23; 200:25-201:11); 3) Warburg

18   was involved in all phases of the prosecution including client meetings and review of the claims in

19   the divisional applications [Granston Decl. at ¶¶ 18-19, Exs. G-R; Warburg Decl. at ¶¶ 10, 13-23,

20   25, Exs. B-K; Transcript of April, 2008 Deposition of William Gerhart ("Gerhart Depo."), Doc.

21   No. 116-30, Ex. I to Opp., p. 50:7-51:15)]  Warburg was available by phone on the day of the

22   filing and even talked to Vaxiion's CEO Gerhart on that day (Warburg Decl. at ¶ 23, Ex. A;

23   Gerhart Depo., pp. 62:9-64:1); and 5) A'Costa was a qualified patent paralegal with ample

24

25

26   [13]      Defendant additionally argues "[a]s an initial matter, whether [Vaxiion] could have filed an
27   improperly formatted PCT application is a question of law.  But in any event, Vaxiion still has been
     able to pursue and obtain foreign patent protection, notwithstanding the missed deadline." (Opp. to
28   Plt.'s Sep. Stmt. of Fact #6.) Although this may be the case, it does not mean that Foley did not breach
     a duty to Vaxiion by missing the deadline or by its actions the night the deadline was missed. As such,
     this particular defense might be relevant to the causation element rather than the breach of duty
     element.

1  experience with PCT filings. (Granston Decl. at ¶29).  Defendant's expert Hricik also notes that

2  Foley's support personnel had "significant patent experience and training." (Hricik Report at 8.)[13]

3         Disputed issues of material fact exist as to plaintiff's argument that Foley's actions leading to

4  the missed deadline rose to the level of breach of duty.  Here, as described above, even if Granston

5  had conducted himself with the  skill, prudence, and diligence of other members of his profession,

6  according to Manbeck (i.e. converting the United States application to a PCT application at the last

7  minute,) he still did not receive all of the materials plaintiff demanded be included in the

8  applications until 10:09 p.m.  Consequently, there is a genuine issue of fact as to whether the PCT

9  Application would have been filed on time.  Defendant has also submitted sufficient evidence to

10  create a dispute of material fact as to whether Foley improperly relied on associate Granston as the

11  primary drafter and contact person on the application, and on paralegal A'Costa for her knowledge

12  about formatting rules for PCT applications.

13              c)    *Elements 3 and 4: Causation and Damages*

14         The Court finds there are disputed issues of material fact as to the breach of duty

15  element of plaintiff's legal malpractice claim and accordingly does not need to address the

16  causation and damages elements.  Plaintiff's motion for summary adjudication with respect to

17  liability for professional negligence is DENIED.

18  E.   Plaintiff's Motion For Summary Adjudication of Liability Re: "Constructive Fraud

19       a.k.a. Breach of Fiduciary Duty/Invalidation Attempts"

20         Plaintiff's second claim is for "Dual Representation of Adverse Interests," which this Court

21  has treated as a claim of breach of fiduciary duty. (Order Denying Remand, Doc. No. 14, at 9.)

22       1.    *Breach Of Fiduciary Duty: Legal Standard*

23         Under California law breach of fiduciary duty is a "species of tort distinct from a cause of

24  action for professional negligence."  Stanley v. Richardson, 35 Cal. App. 4th 1070, 1077 (Cal Ct.

25

26  [13]   Foley also disputes plaintiff's contention that on May 24, 2002, only A'Costa and no attorneys
    worked on the PCT application.  (Based on a billing statement, Ex. J to Motion.)  Foley responds
27  Granston worked on the document that would become both the United States Non-Provisional
    Application and the PCT Application, and the only difference between the two was the formatting,
28  which is was A'Costa's task.  (Granston Decl. at ¶ 29; Manbeck Depo., pp. 188:3-191:16).  Plaintiff
    does not dispute the substantive content of both applications was the same.  (Plt.'s Reply to Def.'s
    Stmt. of Add'l Material Facts, "L".)

1    App. 1995).  The elements of a cause of action for breach of fiduciary duty are: "(1) existence of a

2    fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the breach."

3    Id.; see also Benasra v. Mitchell Silberberg & Knupp LLP, 123 Cal. App. 4th 1179, 1183 (Cal. Ct.

4    App. 2004).

5            The scope of an attorney's duty of care to a client is based upon the California Rules of

6    Professional Conduct, (Id. at 1086,) specifically Rule 3-310.  The relevant portions of Rule 3-310

7    to this case are the following:

8                    (B)(3) "A member shall not accept or continue representation of a
                     client without providing written disclosure to the client where [t]he
9                    member has or had a legal, business, financial, professional, or
                     personal relationship with another person or entity the member
10                   knows or reasonably should know would be affected substantially by
                     resolution of the matter."
11
                     "(C) A member shall not, without the informed written consent of
12                   each client: (1) Accept representation of more than one client in a
                     matter in which the interests of the clients potentially conflict; or (2)
13                   Accept or continue representation of more than one client in a matter
                     in which the interests of the clients actually conflict; or (3) Represent
14                   a client in a matter and at the same time in a separate matter accept
                     as a client a person or entity whose interest in the first matter is
15                   adverse to the client in the first matter."

16                   "(E) A member shall not, without the informed written consent of
                     the client or former client, accept employment adverse to the client
17                   or former client where, by reason of the representation of the client
                     or former client, the member has obtained confidential information
18                   material to the employment."

19   Cal. Rules of Prof'l Conduct, Rule 3-310 (2008).

20           A violation of the Rules of Professional Conduct, in itself, does not provide the basis for civil

21   liability.  BGJ Assoc., LLC v. Wilson, 113 Cal. App. 4th 1217, 1227 (Cal. Ct. App. 2003).

22   However, "[i]t is well established that an attorney's duties to his client are governed by the Rules of

23   Professional Conduct, and that those rules, together with statutes and general principles relating to

24   other fiduciary relationships, 'help define the duty component of the fiduciary duty which an

25   attorney owes to his client'." American Airlines, Inc. v. Sheppard Mullin, Richter & Hampton, 96

26   Cal. App. 4th 1017, 1032 (Cal. Ct. App. 2002) (quoting Mirabito v. Liccardo, 4 Cal. App. 4th 41,

27   45 (Cal. Ct. App. 1992)).  The court may determine the scope of an attorney's fiduciary duty as a

28   matter of law, but it is generally a question of fact whether the attorney has breached a fiduciary

     duty.  Stanley, 35 Cal. App. 4th at 1086-87.  Expert testimony is not required, but is admissible to

1   establish duty and breach of duty in a claim for breach of fiduciary duty where the attorney conduct

2   is a matter beyond common knowledge. Id. at 1087.

3                  a)      Element 1: Existence of a Fiduciary Duty

4         Plaintiff and defendant agree defendant owed a fiduciary duty to plaintiff.  (Opp. at 19.)  The

5   Court therefore finds that the existence of a fiduciary duty between Foley and Vaxiion is an issue

6   not in dispute in this case.

7                  b)      Element 2: Breach of Fiduciary Duty

8         Plaintiff asserts Foley breached its fiduciary duty in three ways: (1) Foley simultaneously

9   represented both Vaxiion and EnGeneIC on the "same subject matter" without disclosing such

10  representation; (2) Foley filed "at least three patent applications on EnGeneIC's behalf that lay

11  claim to the heart of the subject matter covered in Vaxiion's patent applications;" and (3) Foley

12  attempted to invalidate Vaxiion's patent through the instant lawsuit.  (Motion at 10.)

13                 i)      Simultaneous Representation

14        Plaintiff first argues Foley breached its duty to Vaxiion when the Foley Washington D.C.

15  office accepted representation of EnGeneIC because both companies pursued patents using similar

16  technologies.  The parties do not dispute that Patent and Trademark Office Code of Professional

17  Responsibility Section 10.66 (37 C.F.R. § 10.66 (2008) ("Section 10.66 "))[14] provides the

18  ────────────────
    [14]      37 C.F.R. § 10.66 ("Refusing to accept or continue employment if the interests of another
19  client may impair the independent professional judgment of the practitioner") provides:

20  (a) A practitioner shall decline proffered employment if the exercise of the practitioner's independent
    professional judgment in behalf of a client will be or is likely to be adversely affected by the
21  acceptance of the proffered employment, or if it would be likely to involve the practitioner in
    representing differing interests, except to the extent permitted under paragraph (c) of this section.

22  (b) A practitioner shall not continue multiple employment if the exercise of the practitioner's
    independent professional judgment in behalf of a client will be or is likely to be adversely affected by
23  the practitioner's representation of another client, or if it would be likely to involve the practitioner in
    representing differing interests, except to the extent permitted under paragraph (c) of this section.
24
    (c) In the situations covered by paragraphs (a) and (b) of this section a practitioner may represent
25  multiple clients if it is obvious that the practitioner can adequately represent the interest of each and
    if each consents to the representation after full disclosure of the possible effect of such representation
26  on the exercise of the practitioner's independent professional judgment on behalf of each. 37 C.F.R.
    § 10.66 (2008).
27
    (d) If a practitioner is required to decline employment or to withdraw from employment under a
28  Disciplinary Rule, no partner, or associate, or any other practitioner affiliated with the practitioner or
    the practitioner's firm, may accept or continue such employment unless otherwise ordered by the
    Director or Commissioner.

1   applicable standard for determining whether Foley breached its fiduciary duty to Vaxiion when it

2   began representing EnGeneIC. (Hricik Report at 14-15, 21-23; Manbeck Depo. at 66:14-16.)

3        Plaintiff's arguments regarding Foley's breach of fiduciary duty by concurrent representation

4   appear to fall into the following sub-issues: (1) lack of adequate conflict of interest check; (2)

5   existence of differing (adverse) interests between Vaxiion and EnGeneIC when Foley accepted

6   representation of EnGeneIC ; and (3) whether the existence of "possible" differing interests as

7   indicated by plaintiff's expert rises to the level of "likely" differing interests prohibited by Section

8   10.66. The Court finds there are disputes of material fact regarding each sub-issue, which

9   precludes a finding of breach as a matter of law.

10  Sub-Issue 1: Lack of Sufficient Conflict Check

11       Plaintiff asserts in October 2001 when Foley accepted EnGeneIC as a client, Vaxiion had

12  already, in May 2001, "filed its first broad provisional patent application related to minicell

13  technology," something that Foley should have discovered in a basic internal conflicts check.

14  (Motion at 11.) Plaintiff asserts Foley never performed a conflict check, regardless of the

15  existence of a firmwide policy for doing so. (Reply at 11.) In his report, plaintiff's expert

16  Manbeck states based on his examination of Foley's intake forms that "a local Washington, D.C.

17  member of Foley & Lardner's New Matter Committee approved the acceptance of Engenic (sic) as

18  a client on the same date as Client Intake Forms were submitted. Thus, it seems unlikely the San

19  Diego office had a chance to prevent the conflict from arising." (Manbeck Report at ¶ 18.)

20       By contrast, defendant's expert opines that Foley's conflict check system was more evolved

21  than those of other patent firms at the time and "easily met the standard of care." Defendant's

22  expert does not, however, address whether the conflicts check system was properly utilized in this

23  case. (Hricik Report at 25.)

24        Section 10.66 does not allow an attorney continue or take on employment "if the exercise of

25  the practitioner's independent professional judgment in behalf of a client . . . would be likely to

26  involve the practitioner in representing differing interests." 37 C.F.R. § 10.66(a)-(b) (2008).  The

27  Court has already found Manbeck is not qualified to render an expert opinion on conflict of interest

28  issues.  Even if qualified, however, there is a dispute of material fact with regard to the conflict

    check procedures because neither expert can say for certain what measures Foley actually took

1    when it accepted representation of EnGeneIC.

2    Sub-Issue 2: Existence of "Differing Interests"

3         Plaintiff asserts because Foley had already agreed to "pursue maximum protection of

4    Vaxiion's minicell invention" it could not represent another company "pursuing the same minicell

5    delivery technology protection." (Reply at 11.)  In his deposition testimony, Manbeck opined a

6    firm cannot prosecute two patents in the broad area of "minicells," just as it could not prosecute

7    two patents in the area of "semiconductors." [Transcript of July 8, 2008 Deposition of Harry F.

8    Manbeck, Jr. ("Manbeck Depo."), Doc. No. 116-12, Ex. "F" to Opp., pp. 142:24-144:5.] Similarly,

9    although plaintiff's papers do not reference it, plaintiff's expert Roy Curtiss III states "[t]he

10   EnGeneIC provisional application describes nucleic acid delivery mediated by minicells produced

11   by anomalous separation occurring at the poles of bacterial cells.  As such, EnGeneIC's technology

12   is identical to that described previously by Vaxiion in its May 24, 2001 provisional."  [Export

13   Report of Roy Curtiss III ("Curtiss Report"), Doc. No. 94-38, Ex. CC ISO Motion at 13.]

14        Defendant argues, by contrast, that there is a "factual dispute about whether, at the time

15   Foley's San Diego and D.C. attorneys represented Vaxiion and EnGeneIC, they had "differing

16   interests," as contemplated by Section 10.66 (Opp. At 19.)  Defendant's expert Hricik states

17   Vaxiion and EnGeneIC were pursuing very different applications for the minicell technology,

18   making them sufficiently non-adverse for Foley to represent both of them.  (Hricik Report at 22-23,

19   36.)  Hricik further argues, that many different types of patents can utilize minicell technology,

20   explaining a search he ran on the term "minicell" and "minicells" on the U.S. Patent Office

21   Database yielded over 300 hits and data reaching back to 1976.  Accordingly, he states "just using

22   the broad term "minicells" to determine whether a conflict exists is not effective as it will result in

23   too many completely unrelated patent applications." (Hricik Decl. ISO Opp. at ¶ 3.)

24        In its Reply, plaintiff states "the Australian patent prosecution process has already proven the

25   overlap between these inventions" (Reply at 10-11) without any additional explanation, and cites

26   generally to an exhibit to its motion that documents Vaxiion's patent prosecution in Australia. (Ex.

27   F ISO Reply.)  That exhibit indicates a patent application with a priority date of May 28, 2002 that

28   was rejected by the Australian patent office on two separate occasions (Exs. "F3" and "F5" ISO

Reply,) before it was ultimately accepted (Ex. "F7" ISO Reply.)  Plaintiff makes no effort to tie the

- 23 -

07cv00280

1   Australian patent process to any overlap with EnGeneIC's technology, other than making broad

2   assertions about the existence of an overlap.   Plaintiff's reference to the Australian patent

3   prosecution is too generalized to lend much to the determination of whether Vaxiion and

4   EnGeneIC had differing interests at the time Foley began its concurrent representation of both

5   companies.

6        Ultimately, plaintiff has failed to demonstrate that defendant violated Section 10.66 as a

7   matter of law.  It is disputed whether EnGeneIC and Vaxiion had differing interests at the outset of

8   Foley's representation of EnGeneIC.  The parties' conflicting arguments indicate the following

9   material disputed facts: (1) differing expert opinions regarding the potential for conflict of interest

10   between two companies both pursuing patents involving minicell technology, given the disputed

11   size of the field; (2) differing expert opinions as to whether the technologies of Vaxiion and

12   EnGeneIC overlap; and (3) lack of a clear, detailed, and exact indication of which specific patent

13   claims in Australia barred by EnGeneIC's technology, and a thorough explanation of why those

14   claims were barred.  Accordingly, the Court declines to find there was a breach of duty as a matter

15   of law based on the existence of "differing interests" as contemplated by Section 10.66.

16   Sub-Issue 3: The Existence of "Likely Differing Interests"

17        Assuming, *arguendo*, EnGeneIC and Vaxiion did not have differing interests when Foley

18   accepted EnGeneIC as a client, there remains a separate issue as to whether, at the time Foley

19   began representing EnGeneIC,  the two companies were likely to develop differing interests while

20   Foley represented them both.  As indicated above, the text of Section10.66 prohibits a practitioner

21   from accepting employment if the exercise of her professional judgment on a client's behalf  is

22   likely to involve the practitioner in representing different interests.

23        Defendant's expert Hricik opines at the time Foley accepted EnGeneIC as a client it was not

24   "likely" to be involved in representing differing interests given its existing representation of

25   Vaxiion (Hricik Report at 22-23.)  Manbeck, plaintiff's expert, states Foley's concurrent

26   representation of the two companies would put the firm in a position of "possibly having to

27   contend with Vaxiion to determine whose inventor should be awarded the patent coverage on the

28   interfering subject matter." (Manbeck Depo., pp. 136:16-141:19.)  Defendant's expert does not

dispute that there could have been "possible" differing interests between the companies at some

- 24 -

1   point in the future, but maintains "possible" is different than "likely," which is the stricter standard

2   required by Rule 10.66. (Hricik Report at 22-23.)

3       Again, the Court has already found Manbeck is not qualified to testify as an expert on

4   conflicts of interest.  Even if qualified, his opinion directly conflicts with Hricik's, creating a

5   dispute of material fact with regard to whether EnGeneIC and Vaxiion were likely to develop

6   differing interests while Foley represented them both.

7       *ii) Filing "Patents On EnGeneIC's Behalf" and Attempting to "Invalidate" Vaxiion's Patent*

8       Plaintiff next asserts Foley breached its duty to Vaxiion by attempting in 2006 and 2007 to

9   antedate Vaxiion's prior art reference after the PTO's rejections of EnGeneIC's Non-Provisional

10   U.S. Application. (Motion at 5.)  Plaintiff also argues Foley's continued representation of

11   EnGeneIC to date violates Foley's fiduciary duty to Vaxiion. (Plt.'s Supp. Brief at 5-7.)

12       Rule 10.66 contains no provisions regarding a law firm or practitioner's fiduciary duty to

13   former clients, and the parties dispute the proper standard the Court should apply to this portion of

14   plaintiff's claim.  However, the Court concludes genuine issues of material fact preclude summary

15   judgment regardless of the legal standard the Court applies.

16       The facts are undisputed that in 2006 and 2007 a PTO examiner rejected several claims in

17   EnGeneIC's Non-Provisional U.S. Application in part as a result of Vaxiion's Non-Provisional

18   U.S. Application. [Declaration of R. Brian McCaslin in Support of Defendant Foley & Lardner's

19   Motion for Partial Summary Judgment on Conflicts-Related Claims ("McCaslin Decl."), ¶¶ 2 and

20   4, Exs. A and C.]  In response to the examiner's rejection, Foley on behalf of EnGeneIC submitted

21   declarations attempting to antedate the Vaxiion prior art reference (i.e. demonstrate EnGeneIC

22   reduced its invention to practice before Vaxxion).  [McCaslin Decl., ¶¶ 3 and 5.]  On July 25,

23   2007, the PTO withdrew its rejection of EnGeneIC's Non-Provisional Application based upon

24   Vaxiion's Non-Provisional U.S. Application, and instead rejected EnGeneIC's application based

25   upon Vaxiion's then-issued '105 Patent.  [Id., ¶ 6, Ex. E.]

26       Defendant responds it did not breach any duty to its former client Vaxiion by trying to

27   antedate Vaxiion's prior art reference because "as a matter of law nothing EnGeneIC (or Foley) did

28   in the EnGeneIC office action was adverse to Vaxiion or could have resulted in an invalidation of

1   the '105 patent." (Opp. at 21.)[15]  Defendant explains the EnGeneIC office actions were *ex parte*

2   procedures between the patent examiner and Foley on EnGeneIC's behalf pursuant to 37 C.F.R. §

3   1.131.  That regulation provides recourse for an inventor when a patent or application is rejected,

4   allowing the party to "submit an appropriate oath or declaration to establish invention of the

5   subject matter of the rejected claim prior to the effective date of the reference or activity on which

6   the rejection is based." 37 C.F.R. § 1.131 (2008).

7       Defendant argues simply antedating a reference "has no effect on the *validity* of the antedated

8   patent, or for that matter on what possible date of actual reduction to practice the owner of that

9   patent might later establish in, for example, litigation or an interference." (Opp. at 21, citing

10  Hricik Report at 43-44.) In support of this argument, defendant cites to Goutzloulis v. Athale, a

11  patent interference case in which Manbeck himself stated "in an ex parte proceeding, one may

12  antedate a reference by a showing which is less than which would be required for a priority contest

13  [and thus] [i]t is therefore unlikely that the showing in a Rule 131 affidavit will be of material

14  benefit later in the interference proceeding." Goutzloulis v. Athale, 15 U.S.P.Q.2d (BNA) 1461,

15  1464-65 (1990).   Hricik also opines Foley did not act adversely to Vaxiion by responding to the

16  patent examiner's attempt to antedate Vaxiion's technology. (Hricik Report at 42.)

17      Plaintiff states no factual or legal basis in support of its argument that a law firm's antedating

18  a prior client's reference on behalf of a current client pursuant to 37 C.F.R. § 1.131 is a breach of

19  fiduciary duty to the former client.  Plaintiff makes only bald assertions that "[t]his was a course of

20  conduct clearly designed to lead to a finding adverse to Vaxiion." (Reply at 12.)  Plaintiff's

21  unsupported statement is insufficient in the face of Hricik's opinion to the contrary, to establish

22  that Foley's actions in attempting to antedate the Vaxiion patent in 2006 and 2007 was a breach of

23  fiduciary duty.

24      Plaintiff also argues Foley continues to breach its duty to Vaxiion by prosecuting on

25  EnGeneIC's behalf "four patent applications in the area of minicell delivery." (Plt.'s Supp. Brief at

26  _____

27  [15]     Defendant further argues even if the antedating could have had an effect on the '105 patent's
    validity, it in fact had no effect because the examiner ultimately rejected EnGeneIC's antedating
    argument. (McCaslin Decl. at ¶ 6.)  This argument is immaterial to a breach analysis, because the fact

28  that EnGeneIC's attempt to establish an earlier date of reduction to practice failed does not negate the
    possibility that Foley could have breached its fiduciary duty to Vaxiion when it effected the antedating
    attempts for EnGeneIC.

5.)  Plaintiff asserts the USPTO "has clearly identified the inventions encapsulated by those applications as duplicative of the Vaxiion inventions" and cites excerpts from the applications referencing teachings of Sabbadini (the '105 patent) and a Surber application.  Id.  Defendant responds that the documents plaintiff refers to as "patent applications" are actually three USPTO office actions (Def.'s Reply to Plt.'s Supp. Brief at 6, referencing  Plt.'s Supp. Brief, Exs. B-D) and an EnGeneIC response to a separate rejection issues by a patent examiner.  (Def.'s Reply to Plt.'s Supp. Brief at 6, referencing Plt.'s Supp. Brief, Ex. E.)  Defendant explains Exhibits B and C are "restriction requirements" requesting EnGeneIC to elect a "single inventive concept" as required by PCT rules, and asserts the fact that the examiner listed features of prior art "does not mean he rendered a decision (or even considered) whether they contain the same inventions as the claims sought by EnGeneIC."  (Def.'s Reply to Plt.'s Supp. Brief at 7-8.)  Defendant also argues Exhibit E is an EnGeneIC office action response in which it attempted to distinguish the '105 patent from the specific claims EnGeneIC seeks, and that the response has no effect on Vaxiion's patent.  (Def.'s Reply to Plt.'s Supp. Brief at 7-8.)  Defendant does not comment on Exhibit D.  However, plaintiff also fails to explain exactly how the patent office's mention of Vaxiion's '105 patent equates to an adverse action against that patent.  It is apparent material facts are in dispute, precluding a finding of summary judgment.

     *iii) Attempts to Invalidate Vaxiion's Patent Through Instant Lawsuit*

  Plaintiff also briefly states in its Motion that  Foley breached its duty of loyalty to Vaxiion by seeking to invalidate the '105 patent "in the instant lawsuit."  (Motion at 10.)  Plaintiff provides no further legal discussion of this issue.  As a result, the Court finds plaintiff is not entitled to summary judgment on this portion of its breach of fiduciary duty claim.[16]

     *c) Element 3: Damages Proximately Caused by the Breach*

  The Court finds there are disputed issues of material fact as to the breach of fiduciary duty element of plaintiff's legal malpractice claim and accordingly needs not reach the issue of

---

[16] The Court does find compelling defendant's argument that any claim of breach of fiduciary duty arising from its defense in this case would be barred by the litigation privilege. Cal. Civ. Code § 47(b) (2008).  However, Foley has not moved for summary judgment on this aspect of plaintiff's claim.

1  "damages proximately caused by the breach."  Plaintiff's motion for summary adjudication with

2  respect to breach of fiduciary duty is DENIED.

3      *2.      Waiver of Conflict of Interest*

4      Vaxiion learned Foley represented EnGeneIC, at the very latest, in November of 2004.

5  However Vaxiion never raised the issue of Foley's continued representation of EnGeneIC until

6  almost a year after this case was filed.  As a result, Foley argues the Court should find Vaxiion

7  waived its claim for breach of fiduciary duty.  (Opp. at 24-25.)

8      The Court rejected defendant's identical argument in its Order Granting in Part and Denying

9  in Part Defendant's Motion for Summary Judgment on Conflicts-Related Claims (Doc. No. 169)

10  and need not consider it again here.

11                          **CONCLUSION**

12      For the reasons set forth herein, the Court DENIES plaintiff's motion for summary

13  adjudication of liability.  (Doc. No. 94.)  The Court GRANTS defendant's Motion to Strike

14  Evidence Cited in Support of Plaintiff's Motion (Doc. No. 131,) and DENIES AS MOOT

15  defendant's Motion to Strike Evidence of Settlement Meeting Cited in Support of Plaintiff's

16  Motion. (Doc. No. 146.)  The Court overrules all of the parties' evidentiary objections except those

17  the Court specifically addresses above.

18

19  **IT IS SO ORDERED.**

20  Dated: _Dec 18, 2008_

21                          IRMA E. GONZALEZ, Chief Judge
                            United States District Court

22

23

24

25

26

27

28

07cv00280